IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

LEE EDWARD JONES,

                    Petitioner,

v.                              CIVIL ACTION NO.  5:04-cv-0660

EVELYN SEIFERT, Warden, et al.,

                    Respondents.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is a Petition for a Writ of Habeas Corpus [Docket 21], pursuant to 28 U.S.C. § 2254.  The respondents have filed a Motion for Summary Judgment [Docket 34], which has been fully briefed and is now ripe for review.  For the reasons provided below, the Motion for Summary Judgment is **GRANTED** and the Petition for a Writ of Habeas Corpus is **DENIED**.

This case involves the conviction of petitioner Lee Edward Jones on fifty-four counts of sexual abuse and assault in the Circuit Court of Fayette County, West Virginia.  After exhausting his state remedies, Jones raises six grounds for federal habeas relief based on allegations of insufficiency of the evidence at trial, prosecutorial misconduct, constitutionally ineffective appellate counsel, and on two of the State witnesses recanting their trial testimony.  As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 severely curtails the power of federal courts to grant writs of habeas corpus to prisoners in state

custody. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). A federal court may grant habeas relief only in the most extraordinary cases, primarily to correct indisputable constitutional errors in the state criminal justice systems. Under controlling Supreme Court and Fourth Circuit precedent, the alleged insufficiency of the evidence at trial, prosecutorial misconduct, and ineffective assistance of counsel, and the witness recantations are insufficient grounds for granting the writ of habeas corpus in this case.

## I.      Background

### A.      *State Trial and Conviction*

The petitioner, Lee Edward Jones, was once the popular chief of police in Gauley Bridge, a small town in Fayette County, West Virginia. Jones had a reputation as a kind, community-oriented man. Jones, who was a bachelor until 1994, was also known to have close personal relationships with various young men, who would stay at his house and travel with him on out-of-town trips. In 1998, allegations emerged that Jones, who was then nearly forty years old, had sexually abused and assaulted some of those young men between the late 1980s and the mid-1990s. The investigation was prompted by an overnight trip that Jones took in the summer of 1997 with a young boy to Myrtle Beach, South Carolina. Shortly thereafter, an investigation began into Jones's relationships with multiple young boys.

In February 1998, Jones was arrested and then indicted by a grand jury in Fayette County on fifty-four counts of sexual abuse and assault—thirty counts of first-degree sexual assault, nine counts of third-degree sexual assault, and fifteen counts of first-degree sexual abuse. Jones entered a plea of not guilty to all charges. Jones's jury trial commenced on March 1, 1999, in the Circuit Court of Fayette County, Judge Charles M. Vickers presiding. The State was represented

by a special prosecutor appointed from neighboring Raleigh County, Kristin Keller. Jones was represented by privately retained counsel, J. Michael Ranson and Cynthia Salmons. The trial took place over two weeks, with the transcript consisting of thousands of pages. Several witnesses testified, including Jones. As the State acknowledged to the jury at trial, its case was primarily built around the eyewitness testimony of three victims: Jarod "Jarhead" Thompson, who was 21 at the time of trial; Adam Christopher Roop, who was 18 at the time of trial; and Michael Allen Roop, who was Adam's distant cousin and who had just turned 14 at the time of trial.[1] The following represents a brief summary of the lengthy trial proceedings.

      1. Background

The State laid the groundwork for its case-in-chief by presenting the testimony of witnesses who could attest to Jones's access to young men. Two West Virginia State Police troopers who had once been stationed in Gauley Bridge, John Morrison and Bill McGraw, testified that Jones was frequently seen with young kids around. Morrison also testified that Jones's night shifts would sometimes end at 1:00 or 2:00 a.m. and that Jones would then take calls from his home. In addition, George Thompson, Sr., the father of Jarod Thompson, testified that Jarod frequently spent weekends with Jones. Next, Jarod's older brother, George Thompson, Jr., testified that Jarod visited with Jones almost every weekend from when he was young until he was an adult and that Jones had taken the boys on vacation on more than one occasion. Jarod's brother explained to the jury that, during these visits, he would sleep on the couch, while Jarod would sleep in the bedroom with Jones.

---

[1] Counts 1 to 33 of the indictment charged Jones with committing various offenses against Jarod Thompson between the years 1985 until 1992. Counts 34 to 48 concerned charges relating to Adam Roop that allegedly occurred between 1988 and 1992. Finally, Counts 49 to 54 of the indictment charged Jones with offenses committed upon Michael Roop between 1988 and 1996.

The State next presented the testimony of Harry B. Clark, IV, who was known as "H.B." Clark got to know Jones through Jarod Thompson.  Clark testified that he had first met Jones when he was six or seven years old and that he and Jarod had spent several nights together with Jones.  Clark explained that he slept on the couch and that sometimes Jarod also slept on the couch.  At other times, Jarod slept in Jones's bed by himself or in the bed with Jones.  Clark also described a trip to Myrtle Beach that he and Jarod took with Jones and his then-girlfriend (and later wife) Donna Phillips.  According to Clark, their motel room in Myrtle Beach had two beds. Donna slept in one, Jones in the other, and Clark slept on the floor.  Clark explained that Jarod either slept on the floor or in the bed with Jones.  Finally, Clark testified that Jones had initiated sexual contact with him during one of those nights that he spent with Jones in Gauley Bridge. Clark told the jury that he had fallen asleep on Jones's waterbed.  He awoke to Jones pulling his shorts down, followed by Jones touching him.  When Clark made it known to Jones that he was awake, Jones quit touching him.

2.  Testimony of Jarod Lee Thompson

Jarod Lee Thompson was the next witness to take the stand for prosecution, and he was the first to testify as to the particular events charged in the indictment.  Thompson explained that he had first stayed overnight with Jones when he was about seven years old.  Thompson also thought that was approximately when Jones started molesting him, but Thompson could not really remember, and he admitted that it might have been earlier.  Thompson then provided a detailed account of these incidents, which he said continued until he was over sixteen years old. He said that Jones would customarily begin their encounters with oral sex.  Thompson explained that he meant that Jones would put his penis in Thompson's mouth and vice versa.  Jones would

then get behind Thompson and rub his penis between Thompson's legs.  Thompson further explained that Jones would sometimes ejaculate after he finished rubbing his penis between Thompson's legs.  When asked by the prosecution how many times the abuse occurred, Thompson said that it was "countless," but that he thought it had occurred at least once per month on average.  (Trial Tr., Vol. II, 179, Mar. 2, 1999 [Docket 13-4].)

Thompson was then asked how he had come to disclose the abuse.  He explained that he had first revealed the abuse to his mother in 1986 and that he had asked her not to tell anyone about it.  Thompson later decided it was time to tell the authorities—specifically, Sergeant Van Meter of the West Virginia State Police—the details of what Jones had done to him.  The prosecution asked Thompson why he had continued to stay with Jones and subject himself to the abuse.  Thompson explained that when he was with Jones he could do what he wanted, that he got what he wanted, and that "it was just somebody that paid attention to [him]."  (*Id.* at 182.)

### 3. Testimony of Michael McCallister

The State's next witness, Michael McCallister, was 27 at the time of trial.  Although McCallister's direct examination was very short, it was significant because he was the only witness at trial to testify to observing Jones molesting another boy.  McCallister explained that he had visited the defendant at two of the homes that Jones occupied over the years, including one at the Regina Apartments, and was familiar with a boy who was often called "Jarhead," who had already been identified as Jarod Thompson.  McCallister told the jury that one night while he was in the living room of Jones's apartment watching television, he had observed an encounter between Jones and Thompson that took place in the back bedroom.  Specifically, McCallister

testified that he had observed Jones "perform[ing] oral sex and touching and everything on a little boy named Jarhead in his bedroom at the apartment building." (*Id.* at 236.)

On cross-examination, defense counsel challenged McCallister's claim that he had personally witnessed the events transpiring in the back bedroom from his vantage point in the living room. Referencing floor plans and photographs of the Regina Apartments, defense counsel pressed McCallister as to how he could have observed the encounter when there was no clear line of sight between the living room and the bedroom. McCallister then erupted with the following outburst:

> I'll tell you what I do know. I had a clear view of a little boy being molested by that fucker sitting right there. That's exactly what I had. That's exactly what I had, a clear view of him doing something to a little boy in his bedroom, and I seen it, and I'm not lying to you whatsoever. Nobody here am I lying to. That's a sick man.

(*Id.* at 241.) The issue of whether McCallister could have possibly witnessed events that took place in the bedroom from his position in the living room persisted throughout the trial. The investigating officer, West Virginia State Police Sergeant Scott Van Meter, later admitted that there was no direct line of sight from the living room to the bedroom. The State, however, suggested that McCallister had not stated until trial that he had been firmly positioned in the living room, indicating that perhaps he left the living room and witnessed the events he described. Nevertheless, the defense argued strenuously to the jury throughout the trial that McCallister's version of the events was not credible.

### 4. Testimony of Adam Roop

The State next called Adam Roop to the stand. He testified that he had first met Jones through a friend when he was about seven years old. Roop explained that he sometimes stayed

-6-

the night with Jones, and these visits occurred at two places where Jones resided at different times in Gauley Bridge.  Roop told the jury that Jones began abusing him when he was about seven or eight years old.  As with Jarod Thompson, Roop gave a detailed account of the sexual acts that Jones had performed on him.  He explained that the abuse started with "various touching in different places," and then "moved on to oral sex, and then to rubbing of hisself [*sic*] up against me."  (*Id.* at 255.)  Roop clarified that he and Jones engaged in oral sex "both ways," meaning that Jones put his penis in Roop's mouth and vice versa.  Roop described the other touching as Jones touching him with his hands, rubbing his buttocks and his penis, and "basically everywhere else."  (*Id.* at 256.)

Adam Roop was then asked about the circumstances under which he had disclosed this abuse.  He explained that he did not tell anyone about it at first because he was ashamed.  Moreover, Roop thought that nobody would believe him because his father was in prison.  Roop did, however, disclose the abuse to his girlfriend's mother in approximately 1996, but asked her not to tell anyone.[2]  Roop further testified that he first learned of the allegations involving the other boys in 1998 when the officers began investigating Jones, and that, at that point, he provided the details to the officers.  Finally, Roop testified that he had not spoken with the other victims about the sex acts that Jones had performed on him.

On cross-examination, Adam Roop was asked about the frequency of his overnight stays with Jones and who else was there during those stays.  He responded that he stayed with Jones "occasionally" on weekends, and when pressed further, explained that he probably stayed there

---

[2] The State later called Nancy Smith, the mother of Adam Roop's girlfriend, to the stand in order to corroborate Adam Roop's testimony that he had disclosed the abuse to her.  She testified that Roop told her in the spring of 1997 that he had been molested as a child and that he did not want his girlfriend to know about it.

at least once a month during the time spanning from approximately 1987 until about 1992.  (*Id.* at 287-88.)  Roop also stated that he could only remember a single time when any other boy, which was Jarod Thompson, had stayed the night with Jones at the same time that he did.  Roop stated that he had never stayed with Jones while H.B. Clark was there.  The defense's cross-examination of Adam Roop also delved into a Myrtle Breach trip that he and Jones went on with the Thompson family and Donna, who was Jones's girlfriend at the time.  Roop recalled that there were two motel rooms: one for the Thompsons and one for him, Jones, and Donna.  Roop explained, however, that he could not recall the sleeping arrangements in the motel room that he shared with Jones and Donna.

     5.  Testimony of Michael Roop

Michael Roop was the last alleged victim to take the stand as part of the State's case-in-chief.  Michael Roop was the youngest of Jones's alleged victims—just fourteen years old at the time of trial.  Roop explained that he had first met Jones when he was about nine years old.  At that time, Roop was living with his father, David Roop, in West Virginia.  Roop's father was good friends with Jones.  After a while, Jones started taking Roop places.  Roop testified that Jones took him fishing, to his house to watch television, and out on his boat.  Roop also said that Jones would take him to an isolated strip mine called Boomer Strip, where Jones taught Roop how to drive when he was about eleven or twelve years old.  In addition, Roop explained that Jones would buy him toys and presents.

Roop then described how Jones molested him.  According to Roop, the abuse occurred at Jones's house on School Hill Road in Gauley Bridge and at Boomer Strip.  The prosecutor asked Roop to describe what happened between him and Lee.  He explained that Lee did to him

"[s]ome things that a man and a woman would do," involving "[t]heir private parts."  (Trial Tr.,

Vol. III, 16, Mar. 3, 1999 [Docket 13-6].)  After Roop clarified that he was referring to Jones's

penis, he said that Jones "would make me put it—make me put his in my mouth and he would

put mine in his mouth.  And he would rub with his thing on my—my rear."  (*Id.*)  When asked

whether anything else would happen after Jones rubbed up against him, Roop said that

"[s]ometimes this white stuff would come out."  (*Id.* at 17.)

The prosecution asked Roop about the location and frequency of these events.  He

testified that the abuse would take place in the living room or bedroom of Jones's house and in

the front seat of a red, Dodge Ram pickup truck.  He also explained that the abuse occurred on

Sundays and happened "around 30 or more" times.  (*Id.*)  Roop testified that, after he moved

back to North Carolina to live with his mother, he only saw Jones one time.  He explained that

Jones had called his mother and asked whether he could take Roop to Myrtle Beach.  Roop stated

that Jones came and picked him up from his mother's house in North Carolina and that just the

two of them went to Myrtle Beach.  Roop recalled that he and Jones stayed one night at a motel

there, and that "[t]he same thing that would happen at [Jones's] house" happened there as well.

(*Id.* at 20.)  After they left the beach, Jones drove Roop back to his mother's home.

Finally, the State asked Roop how he came to reveal his abuse by Jones.  Roop explained

that about a week or two after he returned from the beach his mother asked him about rumors

involving Jones and other boys.  Roop's mother asked him if Jones had ever done "anything like

that" with him.  (*Id.* at 21.)  Roop eventually told his mother that Jones had molested him.  Roop

then stated that he had not discussed the allegations with any of the other victims, including with

his distant cousin Adam Roop or with Jarod Thompson.

6.   Investigation and Arrest

The State's next witness was West Virginia State Police Sergeant Scott Van Meter, a thirteen-year veteran of the State Police who was assigned to investigate the allegations against Jones.  Van Meter explained to the jury how he came to learn about the allegations and how he met with and interviewed the witnesses.  Van Meter testified that each of the boys that he interviewed was reluctant to talk about what happened to them and became very emotional.  Van Meter also described an interview he had with Jones in January 1998.  Van Meter opened the interview by asking about Michael Roop.  He said that Jones explained that "he was just too good to kids sometimes, did too much for them."  (*Id.* at 123.)  He also testified that Jones had claimed that Michael's mother, Trina Roop, had put Michael up to lying about his encounters with Jones out of retribution.  Jones claimed that approximately three years before the allegations against him emerged, he had arrested Trina Roop following her suicide attempt.  Jones also claimed that he had been involved with admitting Trina Roop to a hospital for a mental health evaluation.  Van Meter then asked Jones about taking Michael Roop to Myrtle Beach, which Jones did not deny.  Finally, Van Meter asked Jones: "What if I told you there was more than one person making a complaint?"  (*Id.* at 125.)  According to Van Meter, Jones then put his head down and ended the interview.

Van Meter next described Jones's arrest in February 1998.  He explained that Jones became very talkative during his arrest and arraignment.  Van Meter testified that, at one point, Jones attempted to explain Jarod Thompson's motivation for lying, stating that Jarod was upset because Jones would not loan him money.  Additionally, Jones spoke about negotiating a plea to

the charges.  Specifically, Van Meter testified that Jones "said something like, 'You-all got me.  I might as well plead to a few of these instead of facing the rest of them.'"  (*Id.* at 127-28.)

Following Van Meter's testimony, the prosecution rested.  In its case-in-chief, the defense presented several witnesses.  The defense's primary strategy was to emphasize the incredibility of the victims' allegations through two methods.  First, the defense highlighted the "overlapping" nature of the victims' allegations, *i.e.*, that multiple victims claimed to have frequently been alone with Jones during the same exact periods of time, while Jones was far too busy with his police work to have possibly been spending so much time with the victims.  Second, the defense attempted to convince the jury that the State's witnesses lacked credibility by emphasizing certain details that the witnesses got wrong about their encounters with Jones, including the physical layout and other characteristics of the places where the instances of abuse were alleged to have occurred.  The defense also attempted to establish the generally good reputation that Jones had among the people of Gauley Bridge.  Finally, the defense suggested that the allegations against Jones were the result of a conspiracy to frame him, perpetuated by certain individuals who sought to falsely incriminate Jones.

### 7.  Testimony of Lee Edward Jones

Jones took the stand in his own defense on March 10, 1999, and his testimony continued the next day.  Jones testified that during the period in question he had worked the night shifts, including on the weekends.  Accordingly, Jones claimed that he would not have been home when the alleged instances of abuse were said to have occurred.  Through his direct examination, Jones laid the foundation for the defense's theory that he was too busy during the time period in question to have been alone with his accusers as frequently as they claimed.  Jones did, however,

admit to occasionally picking up Jarod Thompson and bringing him to Gauley Bridge, and he acknowledged taking Jarod Thompson and H.B. Clark to Myrtle Beach, along with Donna. According to Jones, Donna slept in one bed, H.B. and Jarod slept on a mattress on the floor, and he slept on the box springs.  Jones also described the night before another Myrtle Beach trip when three of the boys—Adam Roop, Jarod Thompson, and George Thompson, Jr.—stayed at his house.

Jones was then asked on direct examination whether Jarod Thompson had ever slept in bed with him.  After first answering "[n]ot that I recall," Jones quickly changed his answer. (Trial Tr., Vol. VI, 309, Mar. 10, 1999 [Docket 14-7].)  He described a trip that he and fellow police officer and friend Gerald Proctor took to Washington, D.C.  Jones explained that they took Jarod Thompson with them and that the three had stayed in a motel.  Jones then said that he thought that he and Jarod had slept in the same bed, "[f]ully clothed," while Proctor slept in another bed.  (Id.)  Jones went on to describe other times that he and Proctor had taken young boys on trips, including to Myrtle Beach.

Jones was also asked on direct examination about his encounters with Michael Roop. Jones said that he could remember at least one instance in which he had taken Michael Roop alone to Boomer Strip, but that it was in a blue Ford Ranger, not in a red Dodge Ram.  Jones explained that he had taken Michael to Myrtle Beach, however, in the red Dodge Ram.  Jones stated that he had long promised Michael and his sister Cynthia that he would take them to Myrtle Beach.  In the meantime, however, Michael had moved to Hickory, North Carolina, to live with his mother.  Jones testified that Michael would call him and ask when they were going to make the trip to Myrtle Beach.  Because he and Donna, who by that point had married, were

not both able to go, Jones decided to take Michael alone.  Jones testified that he had decided not to take Cynthia because he thought it would be inappropriate to travel alone with her from Gauley Bridge to North Carolina.  In July 1997, he drove to North Carolina and picked up Michael from his mother's house.  He testified that he and Michael stayed at a motel in Myrtle Beach for two nights and that he then returned Michael to his mother's home in North Carolina.

During his testimony, Jones described two theories that he had offered to Sergeant Van Meter as to why Michael Roop's mother, Trina Roop, had fabricated the allegations against him.  The first was that Michael had actually been molested by Trina and had accused her of such.  Specifically, Jones related to Van Meter an instance in which Michael had said years before that his mother had molested him in the bathtub.  The second theory concerned Jones's arrest of Trina in 1993 and her subsequent hospitalization.  On cross-examination, the State seized on Jones's knowledge of these facts in order to question his judgment and decision-making.  After all, Jones had testified that he had not taken Cynthia Roop to Myrtle Beach because it would have appeared inappropriate.  Nevertheless, despite claiming to know that Michael had accused somebody else of child molestation and despite suspecting that Michael's mother Trina was out to get him, Jones did not deem it inappropriate to drive to Trina's house, pick up Michael, and stay overnight with him alone in a Myrtle Beach hotel room.

On cross-examination, the prosecution also asked Jones about his training at the police academy.  Specifically, the State asked Jones whether he recalled training that he had received at the academy about the "profile" of a pedophile.  During this exchange, Jones consistently answered that he did not recall learning about the characteristics of pedophiles at the academy.  Finally, at the end of the cross-examination, the prosecutor returned to the issue of Jones's work

schedule as a Gauley Bridge police officer.  Despite claiming throughout the trial that he had almost exclusively worked night shifts, Jones eventually admitted to the jury that he had actually worked all shifts, including the day shift.

### 8.  Conviction and Direct Appeal

On March 12, 1999, counsel delivered their closing arguments to the jury.  The jury began their deliberations shortly before noon.  After deliberating for just under two hours, the jury returned a verdict finding Jones guilty on all fifty-four counts of the indictment.  Thereafter, on June 7, 1999, the court sentenced Jones to an aggregate sentence on all counts of 49 to 115 years in the state penitentiary.  On October 5, 1999, Jones filed a petition for appeal with the Supreme Court of Appeals of West Virginia.  He raised six issues on direct appeal:  (1) that the evidence was insufficient to sustain his convictions; (2) that his due process rights were violated when he was convicted of uncharged crimes; (3) that the State's use of "profile" of a pedophile evidence was contrary to the law; (4) that plain, prejudicial error occurred when the prosecutor referred to his homosexuality; (5) that his due process rights were violated when the prosecutor improperly withheld exculpatory material; and (6) that the prosecutor's questioning of a defense witness about his grand jury testimony was irrelevant and highly prejudicial.  On December 9, 1999, the Supreme Court of Appeals refused the petition without granting oral argument on appeal.

### B.    Post-Conviction Proceedings

On December 6, 2000, Jones filed a petition for a writ of habeas corpus in the Circuit Court of Fayette County.[3]  The habeas petition was assigned to Judge Vickers, the same judge

---

[3] Jones describes this filing as a motion for new trial.  The materials in the record indicate, however, that this document was actually styled as a petition for a writ of habeas corpus.

who presided over the trial.  The first—and primary—issue raised in the state habeas petition was that one of Jones's accusers at trial, Michael Roop, had recanted his trial testimony.  The second issue addressed in the habeas petition was that Jones's counsel was constitutionally ineffective on appeal.

As to the recantation evidence, Jones provided the Circuit Court with a transcript of a sworn deposition that Michael Roop participated in with Jones's trial counsel on November 22, 2000.  At the time of trial, Michael was not living with his father, but rather with his mother, Trina Roop.  Shortly before making his recantation statement, Michael had returned to West Virginia to live with his father, David Roop, who was also present when Michael delivered his recantation statement.  It is undisputed that David was close friends with Jones.  In his recantation statement, Michael maintained that his mother had forced him to make false accusations against Jones (and also to falsely accuse his father David of physically abusing Michael).

According to Michael, his mother told him that if he did not testify falsely against Jones, she would keep him in his room and only let him leave to go to school.  He further explained that his mother locked him in his room, threatened him, and hit him in order to force him to testify falsely against Jones.  Michael stated that his mother was out for retribution against Jones stemming from the 1993 incident in which Jones had arrested her.  Michael explained that as soon as he returned from Myrtle Beach with Jones, his mother had started asking him about whether Jones had molested him.  Michael further claimed that his mother had provided him with all of the details for his accusations, including specific sexual acts that he was supposed to say that Jones had performed on him.

During Michael's statement, Jones's trial counsel asked Michael several additional questions about the other accusers and whether he had spoken with them about the allegations against Jones.  Roop was asked, for example, whether anybody ever told him what the other boys were going to say.  He denied that.  Michael also explained that he had not talked to Adam Roop and had not talked to Jarod Thompson.  In addition, Michael said that the three of them had never gotten together and met with the prosecutor.  Michael did state, however, that the trial witnesses had congregated in "the same room" during trial and had discussed the case.[4]

On February 18, 2004, the Circuit Court denied the habeas petition without conducting a hearing.  The court began by explaining that it had "reviewed [the] recantation of the state's witness, Michael Roop, taken November 22, 2002 [*sic*]."[5]  (Order of Feb. 18, 2004, at 1 [Docket 21-4].)  The court then stated the following:

> The Court has considered the recantation of Michael Roop in light of *State v. Nicholson*, 170 W. Va. 701 (1982), and finds no credible corroborating circumstances that would lead this Court to conclude that Michael Roop did indeed lie at the trial or was coerced to testify.  The defendant had an opportunity and did cross-examine Michael Roop as to his testimony, and his credibility was fairly and adequately tested in the trial.  The Court further finds, having presided at the trial with the opportunity to hear and view the witness, that his trial testimony was credible.  Therefore, the Court denies the request for a new trial based upon the recantation of Michael Roop as new evidence.
>
> The Court is not considering the recantation of Michael Roop or other affidavits submitted by the respondent in this habeas corpus, but will rely on the record therefrom, and finds that this case was tried by a jury determining the credibility and weight to be given to the evidence introduced at the trial.

---

[4] According to Jones, Michael Roop described all of the accusers being brought to a meeting in the same room.  It is unclear whether Michael meant that.  Earlier in his recantation statement, Michael explained that all of the accusers were placed in the same hotel during the trial and that they frequently congregated in one single room.  Michael simply never described being "brought" to a joint meeting.

[5] The 2002 date is obviously a typographical error, as Roop's recantation statement was delivered on November 22, 2000.

(*Id.* at 1-2.) Thus, in the court's view, Jones had not demonstrated "any credible corroborating circumstances to permit [the] Court to conclude that Michael Roop did lie at the trial of petitioner, or was coerced to testify." (*Id.* at 7.) Moreover, the court found no "evidence that the Prosecuting Attorney knowingly relied upon perjured testimony." (*Id.*) Accordingly, Jones was not entitled to a new trial under either state or federal law. In addition, the court declined to grant habeas relief on the second ground of the petition, finding "that defense counsel in the underlying criminal trial and on appeal exercised appropriate conduct under an objective standard of reasonableness." (*Id.*)

Jones then petitioned the Supreme Court of Appeals to review the Circuit Court's denial of his state habeas petition. On June 24, 2004, however, the Supreme Court of Appeals refused his petition for appeal. Next, on June 29, 2004, Jones filed a Petition for a Writ of Habeas Corpus [Docket 1] in this case. In April 2005, while the instant petition was pending, a second accuser, Michael McCallister, contacted Jones's counsel from a state prison he was confined to in North Carolina and recanted his trial testimony. Counsel secured an affidavit to that effect from McCallister dated June 27, 2005. Then, on July 7, 2005, Jones filed a Motion to Stay and Hold in Abeyance the Petition for Habeas Corpus [Docket 19], seeking to stay the federal habeas proceedings so that he could present the newly discovered evidence of McCallister's recantation to a state court in the first instance. On August 25, 2005, the Magistrate Judge to whom this matter was referred issued an Order [Docket 20] granting the motion and placing the federal case in abeyance pending the outcome of additional state proceedings. The parties then conducted a videotaped deposition of McCallister at the North Carolina prison on December 4, 2006.

On January 4, 2007, the Circuit Court of Fayette County, Judge John Hatcher presiding, conducted a hearing on the newly discovered McCallister evidence. Jones appeared in person and was represented by retained counsel. Jones called no witnesses and the court did not view McCallister's videotaped deposition, although the court did indicate at the hearing that it had previously reviewed the transcript of the deposition. The State put on three witnesses at the hearing: the trial prosecutor, Kristen Keller, and two representatives of the West Virginia State Police, Charles E. Shelton and Scott Van Meter.

After the parties filed proposed findings of fact and conclusions of law, the Circuit Court denied the renewed habeas petition on October 30, 2007. (Order of Oct. 30, 2007 [Docket 21-6].) In its written opinion, the Circuit Court made the following findings of fact and conclusions of law:

> 4. The alleged, newly discovered evidence offered by the Petitioner [Jones] consists of a June 27, 2005 Affidavit of Michael McCallister, (hereinafter McCallister) a witness for the State of West Virginia in the underlying criminal case, and a December 4, 2006, Deposition of the said McCallister.

> 5. McCallister was deposed at the Mountain View Correctional Institution in Spruce Pine, North Carolina, where he was then incarcerated. The purpose for taking said deposition was it's [*sic*] use in the Petitioner's habeas corpus hearing. Present at that deposition were Robert Rosenthal and Thomas Smith, counsel for the Petitioner, Fayette County Prosecuting Attorney, Carl Harris, and [State Police Captain Scott] Van Meter. A transcript of said deposition was submitted to the Court on January 4, 2007.

> 6. The Affidavit of McCallister sets forth the following reasons for his giving, what he now claims to be, false testimony during the criminal trial of the Petitioner:

>> (a) [West Virginia State Trooper Charles E.] Shelton "laid out" what they wanted McCallister to say.

-18-

(b)     The police were really after the Petitioner and were trying to work hard against him.

(c)     McCallister was told what he was to say regarding what happened to Jarrod Thompson at the Regina Apartments in Gauley Bridge, West Virginia.

(d)     Keller, Special Prosecutor, met with H.B. Clark, Michael Roop, Donald McCallister, Jarrod Thompson and McCallister at her office, interviewing all of them in the same room at the same time in order that their testimony would be the same.

(e)     Keller told them what parts of their testimony to emphasize and how they should act on the witness stand.

(f)     McCallister and Jarrod Thompson "made up", as they were so told to do by the police, the story regarding the incident at the Regina Apartments.

(g)     McCallister would have done anything to "get" the Petitioner.[6]

(h)     McCallister was being paid very well.

(i)     Anytime McCallister saw Jarrod Thompson and H.B. Clark, crime victims, they each had the same information from the special prosecutor and police concerning what they were to say at trial, and how they were to act on the witness stand.

(j)     After the criminal case against the Petitioner became public, everyone who ever had a problem with the Petitioner, "jumped on the band wagon" against the Petitioner.

7.     The sworn testimony of McCallister, at his December 6, 2005 deposition, sets forth the following reasons for his having given, what he now claims to be, false testimony during the criminal trial of the Petitioner:

---

[6] McCallister explained that his motive for testifying falsely against Jones was Jones's testimony against McCallister in a 1991 rape case. He sought to "get back" at Jones because, even though McAllister was acquitted, he believed that his life had been ruined by the accusations. [footnote added]

(a)     Shelton thought that it would make a better criminal case if he could place McCallister and Jarrod Thompson at the Regina Apartments, thus McCallister lied to fill in the "blanks."

(b)     The witnesses were lying about the Petitioner's conduct because they had all been in trouble at one time or another and the Petitioner could not help them.

(c)     When Shelton interviewed McCallister in North Carolina, he gave McCallister a business card with $100.00 attached.

(d)     Keller told McCallister and his brother what everyone's testimony in the criminal case would be.

(e)     When McCallister talked to H.B. Clark, their conversations were generally about what they were going to do to hurt or harm the Petitioner.

(f)     Keller wanted McCallister's testimony and Jarrod Thompson's testimony to be what she wanted their testimony to be.

(g)     All of the state witnesses met at Keller's office and reviewed their testimony together.  Keller gave each witness their written statements, read their statements to them, and had each of them read their statements aloud to her.  She also told them how to act on the witness stand, and told them not to be emotional on the witness stand.

(h)     Keller gave McCallister money when he was in Fayetteville for the criminal trial of the Petitioner.

(i)     When Van Meter questioned McCallister about his June 27, 2005, affidavit, McCallister told Van Meter the same thing he had told him previously.  He claims he said the same thing, just to have Van Meter leave.  McCallister then wrote attorney Robert Rosenthal informing him that Van Meter had been to see him and that McCallister had lied to Van Meter.

8.     Van Meter and Shelton met with McCallister in North Carolina. At this meeting, Van Meter gave McCallister his business card and $100 for travel expenses incurred while traveling to West Virginia to participate in a separate criminal investigation.

-20-

9.      Any other monies received by McCallister were provided by the Fayette County Prosecuting Attorney's Office for normal and necessary expenses related to McCallister's appearance at the criminal trial of the Petitioner.

10.     Keller did not give McCallister any money.

11.     Keller met with state witnesses in the underlying criminal case in the same manner in which she normally meets with state witnesses in all cases she prosecutes.

12.     Keller neither met with all of the witnesses at one time, nor did she discuss any witness' testimony in the presence of any other witness.

13.     Keller did not tell McCallister, or any other witness in the criminal case, what their testimony should be, nor did she tell any witness to, on the witness stand, act unemotional about what had been done to them.

14.     Shelton, during the course of the investigation, did not tell any state witness what their testimony should be at the criminal trial. Further, Shelton did not provide any witness with money during the course of the investigation, or at any other time.

15.     Van Meter did not tell witnesses what their testimony should be at the criminal trial.

16.     McCallister was not a key state witness in the criminal trial of the Petitioner.

17.     McCallister testified about one incident in which he was in the living room of the Petitioner's apartment and saw the Petitioner molesting Jarrod Thompson in the Petitioner's bedroom.

18.     McCallister was cross examined by Petitioner's trial counsel, and McCallister's aforementioned testimony was refuted by the fact that from where McCallister was sitting, it would have been a physical impossibility for McCallister to have seen the acts which he claimed he saw.

19.     No additional evidence was presented in regard to the issues raised in the original Petition for Writ of Habeas Corpus.

20.     The only alleged newly discovered evidence presented by the
        Petitioner was the alleged recantation by McCallister, and
        McCallister's allegations of a conspiracy to convict the Petitioner
        during the trial of the underlying criminal case.

(*Id.* at 4-8.)

The Circuit Court then offered the following conclusions of law as its basis for denying

the renewed habeas petition:

1.      No new evidence, with the exception of the alleged recantation of
        Michael McCallister, was offered as to the Original Petition for a
        Writ of Habeas Corpus. Therefore, as to the entirety of the original
        Petition for Writ of Habeas Corpus, the Court now declines to alter
        any of the rulings made by Judge Vickers in his February 18, 2004,
        Order, and hereby adopts said ruling, incorporating same herein by
        reference.  Thus, the Court will only address the alleged
        recantation of Michael McCallister.

2.      Habeas corpus relief, based on newly discovered evidence, must be
        granted when the newly discovered evidence 1) was discovered
        after the trial, it is apparent what the evidence is, and its absence, at
        trial, is satisfactorily explained; 2) could not have been secured,
        even with diligence before, the verdict of the jury; 3) is new and
        material, not merely cumulative; 4) should produce an opposite
        result at a second trial on the merits; and 5) is not introduced with
        the sole purpose of discrediting or impeaching a witness on the
        opposing side of the case.  *State v. Frazier*, 162 W. Va. 935, 253
        S.E.2d 534 (1979).

3.      The Supreme Court of Appeals of West Virginia has consistently
        held that recanted testimony is exceedingly unreliable and
        untrustworthy.  This is especially true when the recantation
        involves an admission of perjury by the recanter.  *State v.
        Nicholson*, 170 W. Va. 701, 296 S.E.2d 342 (1982).  An additional
        requirement for Habeas Corpus relief based on a witness'
        recantation, is that the witness' recantation must be credible, and
        corroborating facts must exist.  *Id.*

4.      McCallister's accusation that the Special Prosecutor and two
        veteran West Virginia State Police officers conspired together and
        moulded the trial testimony of each state witness in the underlying
        criminal case, is unsupported by any other corroborating evidence,

-22-

and is found by this court to be wholly incredible, and unbelievable.

5. The Special Prosecutor who prosecuted the underlying criminal case is a skilled trial attorney with more than twenty years of trial experience as a Raleigh County Assistant Prosecuting Attorney. She has prosecuted many defendants charged with sex crimes, and she has, as a necessary part of trial preparation, interviewed many witnesses who were victims of sex crimes.

6. Both West Virginia State Police officers who were involved in the investigation of the underlying criminal case, have a combined total of more than forty seven years of police experience, and have investigated many other sex crimes prior to the Petitioner's underlying criminal case.

7. The Court concludes that no credible, corroborated evidence exists to cause the Court to believe that the aforementioned experienced prosecutor, and the aforementioned veteran law enforcement officers, out of whole cloth, planned, developed, and pursued, both out of court and in court, a plan designed to convict the Petitioner of numerous, serious, felony sex crimes.

8. The Court further concludes that no corroborating circumstances exist which would show, or tend to show, that any or all of the state witnesses in the underlying criminal case conspired to, and did offer perjured testimony against the Petitioner on their own accord, or at the design, behest, and encouragement of any one acting on behalf of the State of West Virginia.

9. The Court concludes that the alleged recantation of Michael Roop does not corroborate McCallister's recantation.

10. The Court concludes that the alleged new evidence offered by the Petitioner, i.e., McCallister's alleged recantation, would not produce any different result at a new jury trial of the underlying criminal charges. McCallister's testimony, unsupported by the other two crime victims, could easily be, and considering the totality of the evidence, would likely be disregarded by a jury.

11. McCallister was not a key state witness in the underlying criminal trial, and, in fact, he provided the least amount of testimony of any state witness. The jury heard and considered McCallister's testimony during the jury trial, and the Court will not now, question the jury's ultimate conclusions.

-23-

> 12. The alleged new evidence offered by the Petitioner would, if anything, tend to have the effect of possibly impeaching some of the testimony of the state witnesses. Such evidence, under our law, does not rise to the level necessary to legally justify setting aside a jury's verdicts, and ordering a new criminal trial.

(*Id.* at 8-11.)

Accordingly, the Circuit Court denied the renewed habeas petition. Then, on June 18, 2008, the Supreme Court of Appeals refused Jones's appeal for a third time. On October 27, 2008, Jones returned to federal court and filed the instant Petition for a Writ of Habeas Corpus [Docket 21], pursuant to 28 U.S.C. § 2254. In his Petition, Jones raises six grounds for habeas relief:

(1) Point I: That the petition must be granted because the recantation evidence presented by Michael Roop and Michael McCallister "reveals a conviction by false accusations and perjured testimony in violation of his constitutional due process rights."

(2) Point II: That Jones's due process rights were violated because his convictions are against the weight of the evidence.

(3) Point III: That Jones's due process rights were violated by the prosecution's use of "profile" of a pedophile evidence at trial.

(4) Point IV: That Jones's due process rights were violated by prosecutorial misconduct in the form of references at trial to Jones being a homosexual and negative comments directed at defense counsel.

(5) Point V: That Jones's appellate counsel was constitutionally ineffective.

(6) Point VI: That the cumulative effect of the above errors was to invalidate the convictions.

On February 6, 2009, Warden Evelyn Seifert and the Attorney General of the State of West Virginia (the "Respondents"), filed an Answer [Docket 33] to the Petition. The Respondents concede that Jones timely filed his Petition and that he exhausted his state

-24-

remedies, as required by 28 U.S.C. § 2244(d)(1) and § 2254(b)(1).  The Respondents have filed a Motion for Summary Judgment [Docket 34], however, arguing that Jones is not entitled to habeas relief on the merits.  That motion has been fully briefed and is now ripe for review.

## II.      Standard of Review

### A.      *Federal Habeas*

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 severely curtails the power of federal courts to grant writs of habeas corpus to prisoners in state custody.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Namely, § 2254(a) provides that federal courts may only entertain petitions for habeas corpus based on the claim that a state prisoner "is in custody in violation of the Constitution or law or treaties of the United States."  In addition, AEDPA imposes "several procedural obstacles" on petitioners. *See Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009).  Section 2244(d)(1) dictates a one-year limitations period in which a person in state custody must bring a habeas petition in federal court.  And § 2254(b) and § 2254(c) prohibit federal courts, with limited exceptions, from granting a writ of habeas corpus to a state prisoner unless he has exhausted his remedies in state court.

Moreover, AEDPA significantly circumscribes a federal court's review of the merits of a state prisoner's habeas petition.  Specifically, 28 U.S.C. § 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is "difficult to meet." *Harrington v. Richter*, 131 S. Ct. 770,

786 (2011). Moreover, it is a "highly deferential standard for evaluating state-court rulings,

which demands that state-court decisions be given the benefit of the doubt." *Woodford v.*

*Visciotti*, 537 U.S. 19, 24 (2002) (internal quotation marks and citation omitted). The deference

required by § 2254(d) applies even when the state court summarily denied relief instead of

providing a written opinion explaining its reasoning. *Harrington*, 131 S. Ct. at 784 ("Where a

state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must

be met by showing that there was no reasonable basis for the state court to deny relief."). In

other words, under § 2254(d), federal habeas courts "review the result that the state court

reached, not whether its decision was well reasoned." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th

Cir. 2003) (internal quotation marks and alteration omitted).[7]

The "contrary to" prong of § 2254(d)(1) is implicated only where the state court (1)

"arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law,"

or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court

precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S.

362, 405 (2000).

Under the "unreasonable application" prong of § 2254(d)(1), by contrast, a "state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

---

[7] In addition, the Supreme Court recently clarified that "review under § 2254(d)(1) is limited to
the record that was before the state court that adjudicated the claim on the merits," with no
consideration of any evidence submitted to the federal court in the first instance. *Cullen*, 131 S.
Ct. at 1398-99.

jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 642, 664 (2004)).  Thus, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 785 (internal quotation marks omitted).  To warrant federal habeas relief, the state court's application must be "objectively unreasonable," which imposes a "substantially higher threshold for obtaining relief than *de novo* review." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted).  Moreover, it is not an unreasonable application of federal law if a state court declines to apply a "specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009); *see also Williams*, 529 U.S. at 412 (explaining that "clearly established Federal law" refers to the "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision").

Finally, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).  Thus, "even if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* (internal quotation marks and alteration omitted).

As these principles make clear—and as the Supreme Court reiterated this past Term— § 2254(d) imposes a powerful limit on the relitigation of claims that have already been rejected by state courts:

> [Section 2254(d)] preserves authority to issue the writ in cases where there is no
> possibility fairminded jurists could disagree that the state court's decision
> conflicts with [the Supreme] Court's precedents.  It goes no farther.  Section

2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington,* 131 S. Ct. at 786-87. A habeas petitioner proceeding under § 2254 bears the burden of showing that he is entitled to habeas relief under this highly deferential standard. *Cullen*, 131 S. Ct. at 1398.

Finally, AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379. Put simply, § 2254(e)(1) "reflects Congress's view that there is no reason for a do-over in federal court when it comes to facts already resolved by state tribunals." *Id.* Accordingly, this court may not "casually cast aside" a state court's factual findings. *Id.*

### B.    Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the

evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249 (1986).  Instead, the court will draw any permissible inference from the underlying facts in

the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most

favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete

evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S.

at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on

an essential element of his or her case and does not make, after adequate time for discovery, a

showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere

"scintilla of evidence" in support of his or her position.  *Anderson*, 477 U.S. at 252.  Likewise,

conclusory allegations or unsupported speculation, without more, are insufficient to preclude the

granting of a summary judgment motion.  *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126,

1128 (4th Cir. 1987).

## III.   Discussion

### A.   *Point I*

Jones's first ground for habeas corpus relief stems from his accusation that his due

process rights were violated by the prosecution's use of false testimony against him at trial,

namely, the claimed perjured testimony of Michael Roop and Michael McCallister.  The "clearly

established federal law" applicable to this claim comes from the Supreme Court's decision in

*Napue v. Illinois*, 360 U.S. 264 (1959).   In short, it is well-established that due process is

contravened where the prosecution's case included perjured testimony and "the prosecution knew, or should have known, of the perjury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue*, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). The same is true even when the prosecution does not solicit false evidence at trial but "allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. The conviction must be set aside if the false evidence presented a trial was "material," *i.e.*, if it could "in any reasonable likelihood have affected the judgment of the jury." *Id.* at 271; *see Giglio v. United States*, 405 U.S. 150, 154 (1972).

In this case, Jones maintains that he is entitled to habeas relief under *Napue* and *Agurs* because "the prosecutor had to have known at the time of trial that the accusations were false and thus the trial testimony perjured." (Petition, ¶ 75 [Docket 21].) Jones asserts that the Respondents have not contradicted Michael Roop's and Michael McCallister's post-trial statements that their testimony at trial and that the trial testimony of the other accusers was false. Moreover, Jones argues that the prosecutors and the police "could not have been unaware that the accusations were false and thus the accusers' testimony perjured." (*Id.* ¶ 89.) According to Jones, "[e]xperienced law enforcement personnel such as those here could not have been unaware that [the accusations] were impossible and thus false." (*Id.* ¶ 90.) In maintaining that the State must have known of the perjury, Jones relies on the themes that the defense emphasized at trial—that the accusers' stories overlapped and that they significantly misstated critical details regarding the times and places of their alleged abuse.

Jones's request for habeas relief on this ground falls flat as to the requirement that the prosecution must have known, or should have known, of the perjury.  Put simply, Jones cannot overcome the factual findings of two state courts to the contrary.  In the first state habeas proceeding, for instance, the court found "no credible corroborating circumstances that would lead [it] to conclude that Michael Roop did indeed lie at the trial or was coerced to testify." (Order of Feb. 18, 2004, at 2 [Docket 21-4].)

In the second state habeas proceeding, the court flatly rejected McCallister's credibility. McCallister claimed that he had been paid by the prosecutor and by members of the State Police, that he had been told by them what to say at trial, and that he had participated in joint sessions with the other witnesses for the State during which they were all told what to say at trial.  The court rejected those claims, deeming McCallister's version of the events incredible.  The court found that the prosecutor had not given McCallister any money directly and that the members of the State Police had only given McCallister money for travel expenses.  The court found that the prosecutor neither met with all of the witnesses at one time nor discussed any witness's testimony in the presence of any other witness.  The court specifically found that the prosecutor did not tell McCallister or any other witness what their trial testimony should be or that they should act unemotional on the witness stand.  Furthermore, the court found that neither member of the State Police had told the witnesses what their testimony should be at trial.  In short, the second habeas court found McCallister's accusations to be "unsupported by any other corroborating evidence, and . . . to be wholly incredible, and unbelievable."  (Order of Oct. 30, 2007, 9 [Docket 21-6].)  And the court found "no corroborating circumstances [to] exist which would show, or tend to show, that any or all of the state witnesses in the underlying criminal case

conspired to, and did offer perjured testimony against the Petitioner," either on their own accord or at the "design, behest, and encouragement" of the State.  (*Id.* at 10.)

Jones can only overcome these presumptively correct factual findings by offering "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Moreover, given that the state habeas court, which conducted an evidentiary hearing, resolved issues of witness credibility against him, it is "particularly difficult" for Jones to establish by clear and convincing evidence that the state court's factual findings were erroneous.  *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).[8] Even if Jones were to clearly and convincingly demonstrate that Roop and McCallister offered perjured testimony at trial, he has not identified any clear error in the state-court's factual determination that the prosecution simply had nothing to do with it.  In short, Jones cannot overcome a state-court factual determination that is fatal to his claim: that no credible or corroborating evidence exists that would show that the State knew or should have known of the perjured testimony.

Jones suggests that the recantation statements provided by Michael Roop and Michael McCallister corroborate each other as to the prosecution's awareness of false evidence being presented.  That is simply not the case.  It is true that McCallister made these accusations, but Roop's statement does not corroborate them.  Roop did describe the State's trial witnesses congregating together in the same hotel room during the trial, but he never suggests that the

---

[8] Insofar as Jones attempts to evade AEDPA's deferential standard of review by arguing that the state habeas courts did not fully and fairly consider the evidence presented, I reject this assertion. Such an argument would turn AEDPA deference on its head, allowing a habeas petitioner to assert that a federal court can bypass AEDPA anytime it disagrees with the result of state post-convictions proceedings or the procedures or analysis employed therein.  Moreover, any procedural errors in state post-conviction proceedings are not cognizable in federal habeas proceedings, as state prisoners enjoy no federal constitutional right to post-conviction proceedings in state court.  *See Lawrence v. Branker*, 517 U.S. 700, 717 (4th Cir. 2008).

prosecutor or any other representative of the State was there or knew anything about it. Moreover, Jones asserts that "both Roop and McCallister described the meeting with the prosecutor and the other accusers." (Petition, § 111 [Docket 21].)  Roop's recantation testimony, however, is not so strong.  Before and after the passage cited by Jones, Roop states that nobody told him what the other witnesses were going to say, that he had never talked to Adam Roop or Jarod Thompson about their allegations against Jones, and that the three of them never got together to talk to the prosecutor. (Petition, Ex. A, 38-40 [Docket 21-10].)  All Michael Roop says in his recantation statement is that when the witnesses were in town for trial, "they put us all, all the witnesses in the same room and we sat there and I didn't say much." (*Id.* at 39.)  It is not clear who the "we" is in that statement, but Roop certainly never mentions the presence of the prosecutor or any law enforcement officer at any group sessions with other trial witnesses.

At its essence, all that remains of Jones's position is his contention that the prosecution "should have known" of the perjury because it should have been convinced by the themes that the defense pressed at trial—that the victims' stories overlapped too neatly and that they had misstated certain details of their encounters with Jones.  I **FIND** that this is an insufficient showing to demonstrate that the prosecutors should have known that perjury was taking place. Such a rule would turn cases built on the eyewitness testimony of multiple victims into easy targets for post-trial recantation.  As the State acknowledged at trial, and as the Respondents have argued in this proceeding, the trial evidence in this case rested on accusations of sexual encounters with Jones that, in some instances, occurred many years before trial when the victims were very young.  In addition, Jones had lived in several different homes in Gauley Bridge and had owned several different vehicles.  As can be expected, Jones's victims could not state the

precise month and date on which any instances of abuse occurred, and they may have confused certain characteristics of the circumstances and places where the abuse occurred. As the state explained to the jury, however, that is often true in cases concerning sexual abuse of minor children. And apparently the jury agreed, resolving the witnesses' supposed inconsistencies and misstatements of fact against Jones in finding him guilty on all fifty-four counts.

In other words, the jury rejected the same theories that Jones now maintains should have convinced the prosecution that perjured testimony had been presented. Given the jury's finding, Jones faces an uphill battle in attempting to establish a claim under *Napue* and *Agurs*. At bottom, although the prosecution almost certainly entertained *some* doubt as to the testimony presented by its witnesses at trial, that type of uncertainty does not establish that the State knew or should have known that outright perjury was taking place. *See Hoke v. Netherland*, 92 F.3d 1350, 1360 (4th Cir. 1996); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988) ("Although the Government may have had doubts about the accuracy of certain aspects of [evidence], this is quite different from having knowledge of falsity."). Moreover, it is insufficient for Jones to demonstrate that the state courts' rejection of his claims based on the recantation evidence was "wrong" or "incorrect." Rather, under AEDPA, Jones bears the burden of showing that fairminded jurists could not disagree as to the correctness of the state court's application of clearly established federal law or that the state court decision was based on an unreasonable determination of the facts. Because I **FIND** that Jones has not satisfied either of these standards, he is not entitled to habeas corpus relief under 28 U.S.C. § 2254 based on a claim that the prosecution "knew or should have known" of perjury.

As a fallback position, Jones argues that his conviction must be invalidated even if the prosecution did not know or should not have known of the perjury because the conviction was founded on perjured testimony.  There is simply no "clearly established Federal law" from the Supreme Court of the United States to support the notion that the prosecution's innocent use of perjured testimony constitutes a due process violation.  Jones cites to *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), for this point, but that decision does not contain any such holding.  In *Kyles*, the Supreme Court merely described the standard for materiality that must be shown in instances where the prosecution improperly suppressed evidence.  *Id.* at 434-45.  Jones also cites to the dissenting opinion in *Durely v. Mayo*, 351 U.S. 277, 290-91 (1956) (Douglas, J., dissenting), which cannot constitute "clearly established Federal law," and which does not stand for the proposition claimed by Jones.  The dissenting opinion discusses evidence "known by the prosecution to be perjured."  *Id.* at 291 ("[T]he State now knows that the testimony of the only witnesses against petitioner was false.").

Finally, Jones asserts that a decision of the Second Circuit stands for the proposition that due process is violated when "the state is made aware of a credible recantation that would most likely change the outcome of the trial and the state leaves the conviction in place."  (Petition, ¶ 73 [Docket 21]) (citing *Sanders v. Sullivan*, 863 F.2d 218, 224 (2d Cir. 1988)).  The Second Circuit itself, however, has recognized that the enactment of AEDPA abrogated *Sanders*, as habeas relief under § 2254 can only be awarded in light of clearly established precedent from the Supreme Court, not from the circuit courts.  *See Drake v. Portuondo*, 321 F.3d 338, 345 n.2 (2d Cir. 2003); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000) (holding that "clearly

established Federal law" means the "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision").

In addition, I note that such a theory would tread incredibly close to a free-standing claim of actual innocence. The Supreme Court has explained, however, that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Although the Supreme Court has never expressly foreclosed a free-standing claim of actual innocence, it has also "yet to come across any prisoner who could make the extraordinarily high threshold showing for such an assumed right." *United States v. MacDonald*, 641 F.3d 596, 616 (4th Cir. 2011) (internal quotation marks omitted). Accordingly, I may not award habeas relief under § 2254 based on the prosecution's innocent use of perjured testimony, *i.e.*, absent a showing that the prosecution "knew or should have known" of the perjury such that the claim would state a due process violation under *Napue* and *Agurs*. Accordingly, I **DENY** Jones's request for habeas corpus relief based on Point I of his Petition.

### B. Point II

The second issue raised in the habeas petition concerns whether there was sufficient evidence presented at trial to support Jones's convictions. More specifically, Jones contends that the "complainants' confused contradictory claims" cannot be reconciled and that therefore no reasonable trier of fact could have convicted him.[9]

---

[9]The "confused and contradictory claims" that Jones emphasizes are: (1) Jones was at work during the time period that Jarod Lee Thompson and Adam Roop claimed to have been molested by Jones; (2) Jones was at work when Michael Roop claimed Jones molested him; (3) the complainants all claimed to have been alone with Jones at the same time and at the same place when he molested them; (4) Jones did not own the truck that Michael Roop claimed he was molested in during the time period that Michael Roop claimed to have been molested in it.

The "clearly established federal law" applicable to this contention is found in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In *Jackson*, the Supreme Court concluded that when assessing a sufficiency of the evidence contention, a court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements . . . beyond a reasonable doubt." *Id.* The *Jackson* Court itself emphasized that a court assessing a sufficiency contention must "give[] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony." *Id.* Under *Jackson*, therefore, I must recognize the jury's resolution of any conflicting testimony. At trial, the complainants' "conflicting" testimony was indeed presented to the jury, and the jury resolved those conflicts against Jones. I therefore **FIND** that Jones has not met the *Jackson* standard, and **DENY** him habeas corpus relief under 28 U.S.C. § 2254 based on his claim that the evidence presented at trial was insufficient to support his convictions.

### C. Points III and IV

In Points III and IV, Jones makes two separate contentions, neither of which merit relief. In Point III, Jones contends that his due process rights under the Fourteenth Amendment to the Constitution were violated when the prosecutor argued that Jones fit the "profile" of a pedophile. In Point IV, Jones contends that his due process rights were violated by the prosecutor's reference to Jones's homosexuality. In essence, both contentions rest on the assertion that the prosecutor utilized improper argumentation at trial.

The Supreme Court has explained that when a due process claim concerns improper argumentation, "[t]he relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Furthermore, the

Fourth Circuit has held that in assessing such a contention, a court is obliged to (1) determine that the prosecutor's comments were actually improper, and (2) determine that the prosecutor's comments were so prejudicial so as to deny the criminal defendant a fair trial. *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988) (overruled on other grounds).

As to Point III, the Supreme Court has never concluded that use of "profile" evidence is improper. Therefore, in the absence of "clearly established" Supreme Court precedent, I am obliged under 28 U.S.C. § 2254(d)(1) to **FIND** that Jones has not demonstrated a violation of his due process rights and thus I **DENY** Jones habeas corpus relief based on that claim. As to Point IV, Jones himself interjected the issue of his homosexuality into the trial when on direct examination he stated that, "I ain't never been homosexual in my life." (Trial Tr., Vol VII., 53, Mar. 11, 1999 [Docket 14-8].) Given the nature of Jones's own statement regarding his homosexuality, the prosecutor's statements cannot be improper under the first prong of *Brockington*. Given that Jones himself made an issue of denying any claim that he was a homosexual, any reference by the prosecutor to that issue cannot have "so infected the trial with unfairness" such that this claim would be cognizable in habeas corpus. *Darden*, 477 U.S. at 181 (internal quotation marks omitted). Accordingly, I **FIND** that Jones has not shown a violation of his due process rights based on improper argumentation and thus **DENY** habeas corpus relief on those grounds.[10]

---

[10]Jones makes two additional contentions: (1) a Sixth Amendment claim based on ineffective assistance of appellate counsel ("Point V"), and (2) a claim based on the "cumulative error" ("Point VI"). These claims do not warrant relief. Jones's claim of ineffective assistance of appellate counsel fails for two related reasons. Jones has (1) not demonstrated that his appellate counsel failed to properly preserve any issues in direct appeal, and (2) failed to established that he has any meritorious claims that would entitle him to post-conviction relief. Accordingly, Jones cannot demonstrate the "prejudice" required to state a claim for relief based on ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). I thus **FIND** that Jones has not shown a violation of his Sixth Amendment right to counsel and **DENY** habeas corpus relief based on that claim. Furthermore, because Jones has failed to state any claim for

### D.    *Certificate of Appealability*

Finally, the court has considered whether to grant a certificate of appealability, as required by Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  A certificate shall not issue unless there is "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied only upon a showing that reasonable jurists would find that any assessment of the constitutional claims by this court is debatable or wrong and that any dispositive procedural ruling is likewise debatable.  *Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683-84 (4th Cir. 2001).  I **FIND** that the governing standard under § 2253(c)(2) is not satisfied in this instance.  Accordingly, a certificate of appealability is **DENIED**.

## IV.    Conclusion

Pursuant to the foregoing, the Respondents' Motion for Summary Judgment [Docket 34] is **GRANTED**.  The Petition for a Writ of Habeas Corpus [Docket 21] is **DENIED** and **STRICKEN** from the active docket of this Court.  A certificate of appealability is **DENIED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.  The court **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: September 8, 2011

Joseph R. Goodwin, Chief Judge

---

habeas relief, there can be no "cumulative error."  I also **DENY** habeas corpus relief based on that claim.